Okay, Counsel, you may proceed. It's Mr. Varga. That's correct, Your Honor. May it please the Court, my name is Douglas Varga. I represent the Plaintiff Appellant, Margaret Holcombe, in this matter, and I've asked to reserve three minutes for rebuttal if that's okay with the Court. We are here on the dismissal of the Plaintiff's amended complaint, which alleges claims arising out of her work as an independent contractor with the defendant. The Plaintiff worked according to the terms of a contract that was in part written and in part oral. The terms of that contract are, we believe, very highly detailed and set out in our complaint, the terms of the contract and other allegations concerning the performance of the contract. We're here because the District Court dismissed the case, we believe, due to its erroneous applications of Rules 8 and 12 of the Federal Rules, Rule 8 obviously requiring a short and plain statement of the claim showing the pleader is entitled to relief, and Rule 12 allowing for dismissal only if the plaintiff fails to basically establish a claim that could ever pass muster. We're here because the District Court, I think it's clear from the decision below, did not, as he was required to do, accept as true all factual allegations in the complaint and construe all reasonable inferences pled in favor of the pleader, in this case, Ms. Holcomb. This case is, on appeal, I think rendered a little more difficult because the District Court, for some reason, divided the Plaintiff's six causes of action into what I think I understood what the reason was. Isn't it the case that essentially all of the claims depend on two promises that she says were made to her, and maybe it's promissory estoppel, maybe it's a contract claim, maybe it's something else, but there are two promises essentially. One is that she would be paid commissions essentially for life based on whatever business she brought into the company, and the other that she was promised that she would have access to documents about sourcing and would be told that the sourcing changed, right? And if there's not a sufficient allegation as to at least one of those, then she wouldn't have, would any of these claims still survive? Well, yes, Your Honor. In fact, the District Court did not address that second case. Which one, which claim would survive if it were insufficiently alleged that she was promised either of those things? Oh, you're referring to all the other claims besides the breach of contract? Yes, right, right. I mean, in other words, what you started with was, oh, you know, the District Court divided it up into these two issues, but aren't those the two promises that underlie, the elements are different for different claims. But unless she was promised one or the other of those things or both, I'm not sure how any of the claims survive. That I would agree with that, Your Honor. The problem is... So then why isn't the issue, as the district judge said, I mean, you're going to say, I assume, that the complaint clearly does plead that she was promised both of those things, therefore all those claims survive rather than fail, but isn't that really what the issue is here? I think it is slowly a pleading issue here. All we have is a pleading issue, and the plaintiff's complaint, as Your Honor noted, has two components to it in terms of the contract formation aspect. That is, if she procured a line of business, she would continue to receive commissions on it, ad infinitum, as long as that was produced. Yeah, and the basic, on that point, the basic allegation is that she was promised the same deal that Frank Holcomb, her father-in-law, had had in that capacity. That was one of the promises that was made to her, yes. Well, with respect to the commissions, that's the underlying allegation. That plus the fact that it is alleged that Mr. Holcomb and a few other people actually received commissions into old age, notwithstanding, quote, little or no activity on the sales front. I think the analogy, Your Honor, would be an insurance salesman who gets continued commission on an insurance. But there's no allegation that the promise extended for post-termination, in fact, when she leaves the company and goes and works for a competitor, right? That Holcomb and the others are not in that situation. Your Honor, the allegation is, granted, there is no specific allegation that says if she is disabled or otherwise no longer able to service the business, she continues to get the commissions. What her deal was is that once she procures the product line and it's there and the customer continues to buy the Karaginan product, she's going to be compensated for that. Even if she works for a competitor, even if she leaves the company and works for a competitor. And Your Honor, if I may, that is why our complaint specifically mentions the individuals with whom she communicated and has these agreements. Because it's our position that, as alleged in the complaint, there were a series of communications over the years that confirmed the terms of this agreement. Well, but let's be very clear. The only allegation that I see that relates to what Frank, the only allegation that says this is what I was promised is I was promised Frank Holcomb's deal. And the only allegation as to what Frank Holcomb's deal was, was that in fact, he received commissions into old age, notwithstanding little or no sales activity, right? There's no other allegation that says these are the terms of Frank Holcomb's contract or I've seen his written agreement or this is what he told me he got in terms of specific terms of the agreement. I would agree with that, Your Honor. So we're drawing an inference from and you're saying this is what you're entitled to, an inference from the fact that Frank Holcomb, who, as far as we know, continued to be at least nominally a sales agent for the company for the rest of his life, we don't even know that, got commissions either into his 70s or into his 80s or until he died, whenever he died, which we don't know from the complaint. And from that, we infer that this was a pledge of lifetime commissions. Post-termination. Including post-termination. Your Honor, yes, I agree with that. However, I think we have to focus on the deal that the plaintiff had and the allegations that she had. The deal involving Mr. Holcomb. But the term, the deal she had was Frank Holcomb's deal. Well, that's the only allegation as to what her deal was. Well, the allegation as to what her deal was, if I may, is set forth in paragraph 22 of the complaint, in part, which says she would continue to receive commissions for as long as that customer continued purchasing Karaginan for the product lines plaintiff had participated in securing. Let me ask you, was the letter dated, I think it's August 31, 2000, is that part of your contract? It is. It is. Well, doesn't that say the monthly salary draws to be $2,000, the 4% commission to be paid on all sales, this is in addition to the $2,000 salary. When the sales commission exceeds $2,000 for any month, for that month it will be decreased and goes on. So doesn't it imply that it's connected or linked to her receipt of a salary? Well, she wasn't an employee, Your Honor. She was, she got essentially a draw, despite what the... Well, I know she wasn't an employee, but this talks in terms of a salary or a draw. Right, right. And then it links it to the 4% commission. Obviously, when she left, she didn't continue to get that salary. She didn't get that draw anymore. Isn't that some indication that that was to be the end of the commission period? Well, maybe on the draw, because at that point in time she would no longer be representing the company. You're talking about the fact that this letter can be interpreted as in addition to the $2,000 salary, you get the commission, and that's talking about, you know, your regular commissions while you're getting the salary, but not after. I wouldn't necessarily interpret it that way, especially in light of the additional discussions that the plaintiff had for the next, over the next 15 years during which she was associated with the company. And again, just going back to the pleading and what inferences can be drawn from the pleading, the plaintiff's position is that once she secured that product line for a particular customer and they continued to take it, that her deal with another party on the other side of the agreement was that she would continue to receive the commissions. And we have named the individuals at the company who were in responsible positions as the president and majority owner of the company, and it's our belief that if this case is remanded and goes back down, we're going to do some discovery and that individual is going to confirm the terms of this agreement. So you've reserved three minutes, Mr. Varn. Yes. We'll hear from Reinhart. Thank you. You may proceed. Good morning, Your Honors. May it please the Court, my name is Kim Reinhart and I'm here today on behalf of the defendant, Appel Lee, Ingredient Solutions. Your Honors have really put the nail on the head here. It is a situation in which initially she referenced an agreement that occurred in 2000. That is the document that was presented. She, in the initial round of briefings, represented that the salient terms of commissions were present in that document. As Your Honor noted, that document clearly contemplates a situation where the person is currently working with the company. It talks about netting the commissions against a base payment of $2,000 and talks about paying for, reimbursing for certain expenses and childcare expenses. There's absolutely nothing that can be inferred from that agreement that would suggest that it would be ongoing after she ceases working with the company. Right. There's nothing in that agreement that says that. But you're drawing an inference from the terms of an agreement, a written agreement, a written promise, that doesn't say anywhere it's an integrated agreement and it supersedes all other promises or anything like that, right? You're absolutely right, Your Honor. The district judge recognized that. I think that's one thing that's important here. The district judge was extremely thorough. He gave two opportunities to come in and argue these issues. He had a very detailed discussion of what he felt would be necessary to create plausibility around some different agreement if it's not in the written agreement, which was referenced and which you said had the salient terms of four commissions. If it's something else, you need to say what it is. Is there any indication anywhere that, apart from this letter in 2000, that there was to be a perpetual commission, that those commissions could outlast her employment? There is no reference anywhere in the amended complaint of any agreement or representation relating to payments after she terminated working with ISA. None. As a district group. Right. What there is, though, is paragraph 23, which says Donna Raven specifically represented to plaintiff on various occasions from 2000 to 2012. So, okay, we haven't got a specific date here, specific conversation. That plaintiff would continue to receive commissions on all sales to customers on product lines she procured, regardless of whether plaintiff was in fact servicing the account at the time the sales were made. So whether she's doing anything with those customers or not, she will continue to get commissions. Right? That's what's alleged, anyway. Yes, Your Honor. But it does not say that she would continue to get commissions if she is no longer working with the company. What if she just stops doing anything? She just stays home. I've got these great customers. She says she had $500,000 a year in commission income rolling in, and she just stops doing anything. Then what happens? Under the terms of that, if that's true, that she continues to get commissions regardless of whether she was servicing the account? Presumably she would be terminated, since she had a completely at-will arrangement, which they agreed. You know, if she ceased to function, then they would presumably not permit her to continue to work. So what she would have to do is to continue to do something for the company, even if it has nothing to do with the accounts in question. So if she makes a lot of sales calls or even one sales call to some other possible customer every year, I mean, granted this seems a relatively unlikely kind of contract for a company to make. I'm just concerned about what it is that is alleged in terms of the promise, that if this promise was made in these terms, it's a somewhat improvident promise. But that's the promise, that even if you're not doing anything for McDonald's anymore, but the McDonald's Big Mac uses your product, for as long as they keep buying the product, she's going to get a commission, regardless of whether she's doing anything, at least with respect to McDonald's, on behalf of the company. So I would say, with respect to that specific scenario, again, I think if she's really — there's probably some latitude in the example the judge provided, where, you know, you have a retiring law firm partner, and that partner gets paid somewhat more than perhaps they are directly worth, because they're transitioning some clients. You know, that's basically what she says, with respect to the gentlemen who were paid until their 70s or 80s. That is not a scenario that has anything to do with the situation where she leaves and works for a competitor. I also just want to — Right, I mean, this all makes sense to me as to what a reasonable contract would be. But I'm still having trouble — that's not exactly what she alleges. And if somebody made this kind of promise, it's — and granted, it's an oral promise, and that causes all kinds of problems. But it's not — it's not a promise that says, look, you know, when you get old, if you keep sort of a good relationship with some of your customers and you help us transition to other people, you'll keep getting your commissions for a while. That's one thing. But when it says whether you're working or not, whether you're servicing this account or not, you're getting a commission, it seems a thin line between doing nothing, doing a little, going to work for somewhere else. How are we — I guess what I'm saying is, here's the allegation. It's a rather specific allegation that the president of the company promised her this. Why doesn't that get her at least to take the deposition of this person who confirms or denies that that happens, or to check out the emails and see whether there's anything in the company files that say this? Or, you know, maybe we deal with it on summary judgment. Your Honor, I think the situation here is a little different, because that is not the only allegation she has, and there are actually inconsistent allegations in here about what the supposed deal was. In Paragraph 9 — well, Paragraph 16, as one of you have pointed out, she says she was going to get the same deal as Frank Holcomb. She doesn't say what the terms of that was. In Paragraph 19, she says she's going to get 4 percent of all revenue from all sales to customers she secured. So that is the initial version of the complaint, all revenue from all customers, regardless of product line. Then in Paragraph 20, she says the October 2000 letter partially memorializes these terms, and the only thing she says that is added is the base salary. Then she says there were other assurances along the way. Well, other assurances that were related to product lines — I mean, it's just completely inconsistent, which I think caused the district court to say, look, they had a lengthy discussion at the first argument. If you really have this agreement, what is it? And the plaintiffs couldn't answer. Well, isn't the point that these allegations, assumed as true, would not support a reasonable inference? A reasonable listener would not conclude, I've got commissions for life, even if I go work for a competitor. Correct, Your Honor. There's no express discussion of post-termination commissions. And absent such a discussion, nobody would reasonably rely on that. That's absolutely right. And cases like Bente Vegna, which say, you know, you don't assume that this would exist absent an express promise for it. If it's all right with Your Honors, I'd like to turn briefly to the standing issues, because I do believe that was a part of the reason that the judge looked at these things as two separate issues. For the different reasons for the dispute? Absolutely. And one of the reasons to do that was because standing comes first, and so he looked at That's correct, Your Honor. And I just wanted to point out that, you know, as Your Honors pointed out, the only sourcing allegation that is supposedly directly to the plaintiff is one relating to access to books and records, essentially. There's no substantive, we will, you know, use these manufacturers, they will meet these standards. The rest of all of that is in paragraphs 29 through 42 and 71. They all talk about the customers. The customers, some customers had kosher requirements. Some customers required GFSI. By the way, there's a paragraph where she said GFSI was not required until 2010. Some customers required use of facilities that were not in China. But she says others were fine with that. So essentially what she's saying is that over the years they assured me they were meeting these customer requirements, and I began to doubt that, and I was forced to leave because I felt that what was going on was wrong. In order to litigate that issue, we would literally have to go through every single customer agreement, not only what their written requirements were, but whether there were any exceptions, because, for example, they wanted a particular manufacturer, but that manufacturer wasn't available at that time. And plainly, as the court held, these are not her rights, both from a prudential standing point and from an Article III injury point. This is really not an appropriate claim for her to be bringing. Well, that's what the district court concluded, but the district court dismissed with prejudice, and you, I think, concede now that lack of standing would be dismissal without prejudice, right? That is true, Your Honor. The judgment should be amended to indicate that it's without prejudice, but that does not mean that she should be permitted to re-plead these allegations in some fashion. If you don't have injury, the court doesn't reach the merits. It doesn't mean that you can go back and try again. So the without prejudice would mean that if, for example, I have no idea, I would doubt it does, but if, for example, the Connecticut courts were willing to, didn't have an equivalent of Article III standing, she could go to state court. I mean, I'm trying to figure out what without prejudice actually means in practice in this case. And the only thing I can think of it could mean is that if you could find a court that had jurisdiction to hear the case that was not limited by an Article III standing-like requirement, you could try that. Is that what I mean? I'm not sure, Your Honor, to be honest. I mean, I've never had a plaintiff try to refile after a court finds that they were not adequately harmed. Right. So I haven't explored that. But I do agree that if that is the ground on which the district court has affirmed, then it is, the judgment should be amended. We did, however, raise the alternative grounds under 12b6. We think that the issues of plausibility are even greater there, and there's a number of other additional issues. Obviously, I won't belabor that unless you all have questions, but I want to just make sure that's noted. The district court actually says, in part of the opinion, that it finds that they don't meet 12b6 either, but then ultimately doesn't have an analysis of that issue because of the fact that they rule on 12b1. All right. Thank you, Ms. Reinhart. Thank you so much. Now we'll hear from Mr. Varga for three minutes. Just briefly, thank you, Your Honor. The district court did not address on the 12b6 level these other what he referred to as sourcing claims. We've already talked about the commission aspect of this agreement, but the fact is we have well-pled allegations that there were promises made to the plaintiff that certain things would be done in certain ways for her protection. Can you explain to me what the damage is there? Because if the allegation, as I understand it, is that she was promised that she would be told if the company was no longer complying with its promises to the customers, in effect. And I'm sort of wondering, so let's assume that she was promised that, and let's assume that the company followed through on that promise, and they told her, we're now using Chinese non-kosher third-rate inadequate product. Go do your best to sell it. If the companies, if the customers cared about that, they would then turn off, right? And if the companies didn't care about that, then she wouldn't be harmed either way because, you know, they would continue to buy. So I'm trying to understand why she suffers damage, not because the company substituted substandard product, which would make it harder for her to sell and earn commissions, but because she wasn't told that they were doing that. Your Honor, the plaintiff was making money on these sales, number one, and she was guaranteeing the source and quality, et cetera. How is she harmed by that? Because, number one, she was put in the position of either having to tell the truth to the client, to the customer, in which case the sales are gone, or she could participate in a fraud, essentially. There was mislabeling concerns here. Sorry, Your Honor. Or she could leave. She was forced to leave. She was forced to leave. She had three options. No, she wasn't forced to leave. She chose to leave under those circumstances. She was put under circumstances, Your Honor, where despite an agreement by the defendant that it would do certain things and act in certain ways and not make misrepresentation. No, no, I get that, but I think Judge Lynch's question is what is the harm? In other words, performance and breach lead to the same outcomes either way. Is there some harm that is associated with breach that's different from what she would be faced with under performance? As a result of the breach of this agreement, Your Honor, the plaintiff could not continue to service those clients. But that would have been true with performance also, right? If they honestly said, oh, by the way, we're not going to live up to our promises to clients, she'd be in the same boat, right? At that point, presumably, if they had been straight with her, presumably she could have tried to work that out or negotiated or make different arrangements. She had to learn about it before she left, and she could have tried to negotiate it at that point. Your Honor, she was, as pleaded, she learned about it, and when she complained and tried to have it rectified, they told her, if you say a word about this, we're going to come after you. And if you either go along or hit the highway. Is there somehow a third-party beneficiary of a promise to another person? We're not claiming that, Your Honor. These are harms to her. Yeah, but there's a disconnect between the promise and the harm. The promise was to the customers. Your Honor, it's a loss of her business. It's a loss of her profession. She's got a reputational interest here as well. She's been in this industry for two decades at least, and part of her representational obligations are to be truthful with her customers. Is it reputational harm that you're talking about? That's how you would seek damages? Part of the damages here would be reputational harm. It would be loss of her goodwill in her industry. It would be a loss of future business opportunities. She had to walk away because she had a Hobson's Choice, and she had a very lucrative position as a sales rep. She obviously was very good at her job, and she was well compensated. But the contract didn't guarantee her these products. It guaranteed her notice in the event of a change in products. Correct, as well as other things, Your Honor. But she would have had the same Hobson's Choice even if she'd gotten the notice. The harm is not connected to the breach. The harm is associated with something else, which is the company's decision to use an inferior product. It's not only that, Your Honor. The company had obligated itself to let her know if they changed, for want of a better word, from a certified production facility to a non-certified production facility, and they didn't. Suppose they did. Suppose they did it, and then at that point she says, I don't like this, and they say, well, that's just too bad. That's what we're going to do. It's cheaper. Where would that lead? Well, that would have to be obviously communicated to the client, and my client would have to do that. And that would be the end of it, right? Where are the damages then? Well, Your Honor, those aren't the allegations. The allegations of this complaint are essentially that the defendant was trying to get the plaintiff to participate in illegal conduct, and she could not do that. And because she could not do that, she had civil and criminal liability that she faced. She tried to resolve the matter, and she couldn't and had to leave. And that is a direct result of the breaches of the defendant's agreement to her. By breaching the agreement, putting her in a position where she faced civil and criminal liability. But, I mean, you're not saying that she had to incur expenses by retaining a lawyer. No, Your Honor. No. All right. If the panel has no further questions, I thank you for your time. Thank you very much. Thank you very much.